Case number 319-0720, Teddy A. Karker v. Sterling Rock Falls Clinic, Ltd. Counselor, you may proceed. Thank you, Your Honor. May it please the Court, Counsel, Attorney McCabe. Simply, this case involves a lady, at that time I think around 36, who went to Sterling Rock Falls Clinic where she was a patient for many years and went there because of certain complaints that were specifically bleeding with sexual intercourse with her husband. All of the experts in this case indicate that is one of the symptoms of cervical cancer and that's what this case is about. She's examined by a nurse practitioner, not a physician. The nurse practitioner, Meredith Johnson, one of the defense in this case, examined her and frankly, her plan was no problem. She did a good job on it and there was such testimony in this case. A couple of things are very important here. One, that she indicated upon her examination that the cervix was slightly friable which means there was some bleeding with examination of the cervix. She ordered an ultrasound at Sterling Rock Falls Hospital and a pap smear. Penny complied with that request and presented herself at CGH Hospital in Sterling and in fact had the ultrasound which turned out to be normal and had a pap smear. The cytotechnologist in this case, Kate Nary, read it as within normal limits. Interestingly enough, in the plan of Meredith Johnson, she said in her chart, W slash O, if pap smear comes back within normal limits, she should be examined by the gynecologist. It wasn't for a long time until we knew who that gynecologist was. There was a Dr. Tugwell there, there was a Dr. McGinnis, there was a Dr. LeMay who was a defendant. Found out who the gynecologist was that was supervising Meredith Johnson, a nurse practitioner, who was performing medical physicians type of examinations. Not a nurse, a nurse practitioner. The law mandated that she be doing those services under a physician's supervision. Dr. LeMay was the supervising physician. On March 8, 1999, when she presented herself at the Sterling Rock Falls Clinic. I learned that Dr. LeMay was the supervising physician when I took Dr. Tugwell's deposition because there's a big checkmark at the bottom. That's all there is. Dr. Tugwell indicated in his deposition that, yes indeed, that was his partner, Dr. LeMay. Why did Meredith Johnson want her to be examined by a gynecologist even if that cap smear came back as normal? Because she was suspicious. Based upon that symptom, I just relayed it to this court, that it might or could be cervical cancer, which all agree in this case. I refuted that cervical cancer is a life-threatening condition. Of all the differential diagnoses of this particular condition, leaving with sexual intercourse, the only life-threatening condition is cervical cancer. Now, after 3-8-99, Penny Pegger never heard again from Meredith Johnson, Dr. LeMay, or anyone in the Sterling Rock Falls Clinic. I call your attention to the brief of the appellee in this case that says she was told. No, she was not told by anyone. The only testimony there was from Meredith Johnson was that I may have told her the plan that I made by my custom and usage. I have no independent recollection. And it's unrefuted about that fact that she was never told. Now, in the record, there was an appointment made by some unknown person of the Sterling Rock Falls Clinic on March 23, but it was peculiar because Christina Wade, who charted this, said, I don't know who made this appointment. Also, she testified that when a patient at Sterling Rock Falls Clinic fails to make an appointment, they write on that chart. The fact that we went through that in the record shows that there is no such thing under the name of Penny Pegger. Penny Pegger testified she never knew any appointment, nor was there ever a call from her to be rescheduled to see anybody. It wasn't until October of 2001 that she returned to Sterling Rock Falls Clinic complaining of a progression of the symptoms that I just related to this honorable court. She was examined by another nurse and then examined again the next month in November. My recollection is correct, by Meredith Johnson, who had her examined and set up an appointment with Dr. Tugwell. He examined her in December, and he actually referred her after he diagnosed cervical cancer, referred Penny Pegger to Dr. Hodel in Peoria, Illinois, for treatment of this cervical cancer. Now, it's very important to know in this case that is all that Penny Pegger did is what she was told. She assumed that she was fine. It is ingenuous, I think, that the defendants in this case assert contributory negligence of Penny Pegger when they are the persons. These defendants, Sterling Rock Falls Clinic, Dr. LeMay, and Meredith Johnson, who had the special knowledge and who comprised the physician-patient relationship, not Kate Nering, the cytotechnologist who, without any doubt, misread that pap smear. Now, we do know that pap smears are non-diagnostic. We also know that March 8, 1999, maybe 32 or 34 months before Penny Kiker was diagnosed with cervical cancer, no one contacted her. We do know that. What the condition she had on March 8, 1999 was unknown. There was no biopsy. The only way a cervical cancer can be diagnosed is through a biopsy. She thought she was okay, nothing to worry about. I submit to this Court the underlying theme in this case is why did not the defendants in this case advise her that she might or could have had a life-threatening condition? That's all any patient wants to know. But nobody told her, and that's undisputed, notwithstanding the brief of the employees in this case. You can check that. I think it's pretty well admitted. I think it is incorrect. So where is the contributory negligence in a case where the patient goes to the clinic, sees a nurse practitioner who is supervised by a gynecologist, and never told the condition? Now, Dr. James Dolan, who is a gynecologist in Chicago area, Park Ridge, and also a court-certified oncologist, testified that on March 8, 1999, Penny Kiker might not even have had cervical cancer. But if she did have some abnormality there, he says, it would have been done simply with a surgical procedure, a very small one, that has approximately 95-100% of the cure, no problem. But after this delay, this delay is the fault of the defense in this case. She no longer could have any surgical procedure. She had to have implants of radiation, which has caused her to have bowel and bladder incontinence. It's affected her entire life. She can't go anywhere socially because she has accidents and so on and so forth. And I think it's in the record sufficient enough for this court to understand her predicament and her permanent injuries. And she's had subsequent surgery from the radiation in this case, testified to by Dr. Oming in Clinton, Iowa, who continues to follow her. So, firstly, we think there was a serious problem in this case of contributing negatives. She should never have gotten into the record. Certainly, the injury could have determined that she was guilty of contributory negligence and it was prejudicial. We consider that to be reversible here. Now, we have the issue, again, of sole proximate cause. The problem with that is that the defense in this case called, and we can argue to the colossal moment as to whether it's proper or improper. I think it's pretty well settled now that Southern defendants do not go on the jury verdict form. But the big question is, is the conduct of Southern defendants admissible in a trial? In this case, the defendants called to Gary Gill, who was a cytotechnologist, who says she read it wrong. We all know that. Many have read wrong. There's also false negatives. We know that that's why they're not diagnostic. And the only way to diagnose cervical cancer, as I said, is by biopsy. They also called Christine Booth, who was a pathologist, who said the same thing, that this was an abnormal pap smear. But called to the stand was the cytotechnologist who did misread the pap smear. And I can't explain to this court her demeanor in that witness chair and the fact that she was brought to, I think, actual tears. She admitted that she misread it. And I think it was so highly prejudicial. That is why we're here. Because of those errors and other errors that we have indicated in our brief, which we shall stand on. I think it was error. A ready case. Some argue that only applies to 218 and not to 211-17. 218 is the medical malpractice. And I do not see a distinction, I submit to this court, between the two except for joint and severed liability. We know under 211-18 there is no severability. They're all joint and severed liable. Now, they have to be. But when you're talking sole proximate cause, you're not talking about joint and severed liability. You're talking about one person being. That's correct. Other than the defendant. Thank you, Your Honor. In this case, we had Dr. James Golan testify to this jury that Dr. LeMay had a duty and Mary Johnson had a duty to follow up and simply tell her she had a life-threatening condition. It's undisputed. Nobody told her to do that. But sole proximate cause. So when the experts, the plaintiffs had, and also Dr. Beckman, who is a Ph.D. and teaches nurse practitioning at Rutgers University, they indicated that most of these defendants were guilty of negligence and deviation. Wasn't that a question of fact for the jury, though, as to whether Kate Naring's negligence was the sole proximate cause? You know, I don't think so. I'll tell you why. Number one, Kate Naring is a cytotechnologist. And I think that when this jury hears evidence, evidence, the deuce of the defendants LeMay and also Mary Johnson, that they were negligent, how can we say that they weren't negligent? More than one person could be negligent. And 1204 was given in this case, that jury instruction. So you can't. How does a plaintiff, we had two experts testify as to the selling defendants negligence in this case? And what does that have to do, I respectfully submit to this court, with the question in this case was Dr. LeMay or Mary Johnson, or both of them, negligent? There was ample evidence, overwhelming evidence. As I said, they did nothing for almost three years. So why would we have evidence of Kate Naring? They had the patient. I mean, isn't, what would bar them from presenting a theory, the defendant from presenting, I mean, what's the legal bar to them presenting a theory that Kate Naring was the sole proximate cause of the pair of clients' injuries? Because if one or two defendants were negligent, it would be inadmissible. And we have the... Well, didn't the jury decide that, who's negligent and who isn't? I mean... Well, the court should decide that. If the court thinks there's sufficient evidence of negligence on the defendants, why would you want to bring in another case? That's what it really comes to. Isn't your argument negated by the Leonardi case? No, it isn't. We do not think so, Your Honor. We do not. We think that... Then they argued that there was improper focus on the conduct of the settling defendants. Well, sure, sure. And, of course, if you look at why, who's going to settle under the Contribution Act if we're going to continue to bring these settling defendants into court? The plaintiffs aren't going to settle. We're not going to go through this type of thing and have them bring the settling defendants into court and testify. Defendants aren't going to. So, you know, where are we going with this? That's our... And as far as the sole proximate cause argument, isn't that covered by NOLA? I think... Well, NOLA now is in the specialist case. And I think that it's different. And I will at one point say this, if I may. When Reddy was decided, which was not a medical malpractice case, but Reddy was decided, it reversed the first district appellate court and said that, you know, that you cannot put settling defendants under jury verdict for them. And then they reversed on the... conduct of... Actually, it said it back down in the first district. It says, determine whether or not the conduct of settling defendants should be admitted into a trial. And then the... Thank you. And then the first district found, yes, it should be admitted. But then on a petition to leave to rehear it. It's pending now before the Supreme Court. After NOLA, the Supreme Court granted the leave to that petition. We don't know yet what's going to happen. But that becomes the issue. It has been, and I just will submit, the issue has been confusing for both courts and trial lawyers. Thank you very much. Thank you, Counselor. Counselor, you may continue. Good afternoon, Your Honor. Counsel. I think the... The main issue is the question about the... whether defendants were entitled to pursue a sole proximate cause defense. And at the present state of the law, they certainly are. I don't know if this... The second decision to take the... What's the name of the case? I can't think of it right now. Up on... Randy. Yes. Thank you. Up for another look. I don't know that that's going to have any impact on this whatsoever. But... And we definitely can't speculate. But right now, the whole notion that a sole proximate cause defense is available is well and healthy in the court. We are perfectly entitled to present that and to present it on the basis that there's only... The evidence only tends to show. It's not a... It doesn't require a huge modicum of evidence. It's just that there's a tendency... The right to endeavor to establish by competent evidence the conduct of a third person as the sole proximate cause. In this situation, that was where we went. We didn't... The defendants did not admit any causation in this case. They said... They pointed the finger completely toward the review by Kate Nearing of the initial tests and said, this is what is setting up the situation that we need to... Her result, that there was nothing wrong, is what everyone relied on. But nevertheless, the defendants did seek to have Plaintiff come back. The record is really full of backup for their effort to get her to come in. They scheduled appointments on 3-11, then again on 3-18. The final one was, I think, 3-23. I'm not quite sure of the exact time. And that was your grounds for the failure to take action? Yes. Yeah. I mean, there's testimony. I have it right here by the nurse who looked at her who says, if everything is normal, there's no explanation for her symptoms. And so I wanted her to see, to follow up with one of the doctors for further evaluation to determine the cause of her symptoms, or at least try to. They were... That's Nurse Johnson, Mary Nurse Johnson. They were... She testified several times that everything was fairly normal. The bleeding, what they saw was not terribly alarming, but it's common practice to follow up. And they wanted to, and they tried to get her to come back. She canceled the appointment. There were no appointments set up. She did not keep it. Nor did she keep the recommendation that she come back at least a year later. For a new pap smear and evaluation. They're disputing some of that, though, aren't they? The other side. Well, there's... Yes, she says that she didn't make the appointment. She didn't miss the appointment. She never was told to do all this. Yes, she is. And I have to say, this must just go to a jury determination. The standard review on all of this is in favor of jury and the ability of the jury to take the evidence and make a judgment about the thing. So, I don't think... I know she said in her own defense that she never was told any of this, but the jury didn't buy it. So... The... Nolan case, by the way, which is now a 2009 case, is still very good law. We have no idea what's going to happen when the other one goes up. But... When Reddy goes up. But the Nolan case is good law, and it says that it doesn't matter about distinctive factual features of medical malpractice and asbestos suits, that those different features of them might require different standards of proof has been completely rejected by the Supreme Court. They say it's the same standard of proof to establish causation. The jury was properly instructed on the sole proximate cause. Reliance on this principle that there can be concurring causes and the instruction 1501 is proper is misplaced as it presumes that a defendant's conduct is at least a proximate cause of the plaintiff's injury. That's a Leonardo case. The defense theory was that Ms. Naring was the sole proximate cause of the plaintiff's injury. And the jury definitely heard evidence tending to show that Naring's conduct was the sole proximate cause. And the fact is, as counsel said, that she openly admitted her error or her sorrow for her conduct. And so the jury had a very solid representation of what had happened. And our position is, of course, that the defendants were doing what they should to try to get her back. They're following normal procedures. She didn't return. She had appointments that were not kept. And by this time, it took, I think, 20 months before she did return and the diagnosis was much more serious. Let me ask you this. Was this a general verdict? Did the jury find anything that was going to be fine for the defendant? No, I don't believe they did. Were there any special findings? I don't believe so. In other words, do we know whether the jury found, A, that Kate Naring was the sole proximate cause or, B, the defendants weren't negligent? Do we know? No. And I believe that's a difficult part of the case is that there isn't a defined. We don't know which ones they got, the other contributory. Negligence requires 50%. We don't know if that was... They weren't told to break it down, though, in the verdict form. No. No. So it's a cumulative effect of all of the rulings, I believe, that the jury's relying on the... The trial court relied on the jury's findings that this was a... There was no proximate causation attributable to the defendants for this very serious problem. You know, with regard to Dr. Dolan, your point suggests that the trial court was in error not to allow Dolan to testify about the nurse practitioner. How much evidence was in this record with regard to the knowledge Dr. Dolan had about the nurse practitioner and the procedures and methods? I think there was extremely little. I don't think he said anything. He had not used a nurse practitioner in his entire 20-year career. This was not part of his modus operandi. He testified some 20 pages about what had happened, about the results she came to and so on, but he never... He never suggested that she... Well, it appears that Dr. Dolan never had worked with a nurse practitioner. Is that correct? That's right. He did not use them. That's exactly right. And during his time... The argument the other side is making is with regard to... It wasn't nursing standard. It was the communication between a nurse practitioner and a doctor, and therefore Dr. Dolan could testify. I think that's part of their argument. And why do you suggest that's not a fair argument? Could you repeat? I'm sorry, but their argument is... Their argument is that he's a doctor. He can testify what he would expect with communications between a nurse practitioner and a doctor. That's part of their argument, as I understand it. Now, as I understand it, Dolan, though, never worked with a nurse practitioner about their... He never did, and he didn't... I don't think he testified or anything about the communications. He simply said what she... The doctor talked about what she observed and what her report said, and then the very last page of Dr. Dolan's testimony, he suggested that she should have acted differently in her communication to her supervising physician, Dr. Lemay. But that's the total conclusory suggestion, that there was anything wrong with the behavior of the nurse practitioner in this situation, was that she should have acted differently in communication. You're referring to this standard of care as their position, right? That he was saying that the nurse practitioner should have done something different in the communication to the doctor, right? Am I saying that? No, they're saying that. Oh, yes. Yes, they are. But there was no testimony regarding that limited issue of the appropriate communication from the nurse to the physician. That part of Dr. Dolan's testimony was properly excluded because there was nothing in there about communication that should have been happening between her and the doctor. Dr. Lemay, there was no suggestion that she was improperly or insufficiently communicating with Dr. Lemay. It just talked about her own findings and whether he thought that they were correct. I mean, I feel that Dr. Dolan evaluated her work on the basis of the physician and said, oh, she said all of this, but she was obviously wrong. But that doesn't mean that she should have communicated something differently to him or did, or even tried to communicate with him. I'm wondering whether I should just stand here. There really is, as I started with, there's no legal bar to presenting the fact that nearing was the sole approximate cause that her misreading of, and she openly admitted that completely misread everything. But that was what initiated the problem in the case. And that is a question for the jury. I think Justice Schmidt asked previously whether there is a sole approximate cause is probably an issue that the jury may determine. And I think I'll leave it there at this time. Thank you very much. Thank you, Counselor. Unless you have questions, of course. Thank you, Counselor. Counselor? Thank you, Your Honor. First, as far as the law is concerned, the Houghton versus Memorial Hospital, page 24 of our brief, just an answer to a question in Illinois Supreme Court, found no error in the trial court's refusal of a sole approximate cause instruction as the defendant hospital never presented any evidence that only the negligence of persons other than the hospital employees, i.e. retreating physicians, proximately caused plaintiff's injury. And I submit to you, Your Honors, that through this entire record, you will find not one witness in this case, including defendant's experts, that testified that Kate Nary was the sole proximate cause of plaintiff's injuries. What did the verdict form look like? You know, I believe, I think we had an A verdict for the plaintiff. We had a B verdict form, which would be the contributory net comparative, that verdict B form. And the third verdict form would just be we find the jury, we find the jury. The jury finds for the defendant against the plaintiff. Those were the three that I recall constantly increasing. There were no special interrogatories. No special interrogatories. So it would be fair to say that we can't say as we're sitting here whether the jury found A, that Kate Nary was the sole proximate cause, or B, that either, or the defendants weren't liable either because A, they weren't negligent, or B, there was no proximate cause between their negligence and the injury. Or contributory negligence. Well, that would have been in B, though. That verdict B would have been. I think they would have had the amount of her negligence. So you're right, it would be. We don't know what the jury concluded and the reason for the verdict. I would just like to add, if I may, that Dr. Dolan, there was an offer approved for his entire testimony in this case that we made because, and I would refer to Wingle, which the Solving Court, inciting Wingle, stated without reading it all to you, that's on page 32 of Appellant's brief, as such, the allegations of negligence do not concern an area of medicine about which there would be a different standard between physician and another school of medicine. Furthermore, it was established that the allegations of negligence were well within the testifying doctor's knowledge and experience. We believe that a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital. And I will respectfully submit to this Court that Dr. Dolan was very well qualified in that special knowledge because as a gynecologist and oncologist, he relies on communication from his team, although he didn't have... The problem I've got with Dolan, there's a second foundational requirement for a doctor to testify, and he wasn't familiar with the methods, procedures, and treatments observed by other practitioners in nurse practitioner Johnson's community or in a similar community, and Dr. Dolan wasn't a nurse practitioner and also never worked with nurse practitioners. Is that fair to say? No. He never had, as I recall, a nurse practitioner he worked with himself, but he knew about nurse practitioners and the offer of proof has ample evidence that he was very well aware of nurse practitioners and what they do and that they should be supervising... Let me step back for a second. He never worked with a nurse practitioner? He never had... He worked with nurse practitioners, but he never had a nurse practitioner, and many of his colleagues he was involved with had nurse practitioners as well. And he never supervised a nurse practitioner? That I can't say. I don't think so. If he did not have one working under his direct employment, then I don't think he would have supervised. But I think the special knowledge exception as in lingo doesn't really mandate that he has to do that. He has to just show up... How did he get this special knowledge? Working with his entire team and other people... What team? As an oncologist, he has obstetricians and gynecologists refer him to answer cases. That's his specialty. And so he is familiar through them what communications they made and so on and what happened. So is he an obstetrician? So can he testify as an expert on obstetrics? Because his colleagues are obstetricians and send him cases? Well, I've got colleagues. OBGYNs, I should say. Sorry, I just said obstetricians, but OBGYNs are both. Because he takes referrals from both of those fields. So he's an oncologist? He is a gynecologist. And I would like to add too that Dr. Beckman from Rutgers testified that whenever you have bleeding, if I didn't say it, forgive me if I did already, that cervical cancer is the diagnosis until ruled out. And that is the basis for... And I think you understand that. I did leave out an important case, but I submit to this court that it is the legal duty under the law of the state of Illinois for a physician to notify his patient or her patient of a life-threatening condition. Thank you. Thank you. Thank you for your arguments. We will take this case under advisement. This panel will adjourn and the court will adjourn until tomorrow morning.